**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

───────────────────────────────────────

**ELAINE L. CHAO, Secretary of Labor,**

        **Plaintiff,**　　　　　　　　　　3:01-CV-827
　　　　　　　　　　　　　　　　　　　　　　　　(NAM/DEP)
**v.**

**JAMES C. DOCSTER, INC.; DODGE-MARKHAM
CO., INC, 401 K Pension Plan; ESTATE OF JACK
DOCSTER,[1]**

        **Defendants.**

───────────────────────────────────────
───────────────────────────────────────

**APPEARANCES**　　　　　　　　　　　**OF COUNSEL:**

UNITED STATES DEPARTMENT OF LABOR
HOWARD M. RADZLEY
Solicitor of Labor
PATRICIA M. RODENHAUSEN　　　　　Jennifer D. Weekley, Esq.
Regional Solicitor
*Attorneys for Plaintiff*
201 Varick Street
New York, New York 10014

CAHILL & BEEHM　　　　　　　　　　James Cahill, Esq.
*Attorneys for Defendant James C. Docster*
145 Washington Avenue
P.O. Box 119
Endicott, New York 13761-0119

LEVENE GOULDIN & THOMPSON　　　John H. Hartman, Esq.
*Attorneys for Defendant Jack Dockster*
P.O. Box F-1706
Binghamton, New York 13902

NORMAN A. MORDUE, Chief Judge:

───────────────

[1] The caption was amended in March 2006 to include the "Estate of Jack Docster" after defendant Jack Docster died in November 2005.

**MEMORANDUM-DECISION AND ORDER**

**I.     INTRODUCTION**

Plaintiff Elaine L. Chao, Secretary of Labor commenced the instant action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, alleging that defendant Dodge-Markham Co., Inc., failed to forward employee and company contributions to its 401(K) pension plan totalling nearly $43,000.00; that defendants James C. Docster and Jack Docster, trustees and fiduciaries of the pension plan, failed to discharge their fiduciary duties with respect to the pension plan and that defendants are jointly and severally liable for said violations under ERISA.

Plaintiff now moves for summary judgment on the amended complaint pursuant to Fed.R.Civ.P. 56.  Defendants James C. Docster and Jack Docster oppose said motion.

**II.    FACTUAL AND PROCEDURAL BACKGROUND**

According to the amended complaint, from March 1995 and thereafter the Dodge-Markham 401(K) pension plan was an employee benefit plan within the meaning of ERISA.  The pension plan was established to provide benefits to Dodge-Markham employees and the employees of its subsidiaries.  The pension plan was a contribution plan funded by employee salary deferrals and employer contributions.  The terms of the pension plan required employee salary deferrals to be paid to the pension plan no later than 90 days after the receipt of the contribution.  Plaintiff asserts that when Dodge-Markham began to experience financial difficulties in or about 1995, its President, James Docster started retaining some employee contributions rather than forwarding them to the pension plan.  Plaintiff asserts that James Docster was involved in systematic "juggling" of company cash insofar as deciding which bills

2

and financial obligations to pay as funds became available. Included in said "juggling" were contributions owed to the company's 401(K) plan. Plaintiff contends that Jack Docster, a former president of Dodge-Markham and its CEO, Secretary and Chairman of the board of directors, participated in this "juggling" of company cash which included failing to make contributions to the retirement plan as required by ERISA. In or about late spring or early summer of 1999, Jack Docster became aware of the grave nature of the company's financial condition and resumed his status as company president. Plaintiff alleges that James and Jack Docster failed to discharge their fiduciary duties with respect to the pension plan and caused the pension plan to engage in certain transactions that violated ERISA, all in violation of ERISA. It is undisputed that funds owed to the retirement plan were withheld and never repaid by the time the company became defunct in 2001. What is disputed is the nature and fact of the fiduciary duty, if any, owed by each defendant and the extent to which each defendant may have breached said duty.

Defendant Jack Docster had been the president and CEO of Dodge-Markham until his limited retirement in 1992 or 1993 at which time his son, James Docster, took over as president and a Member of the board of directors of the company. Although James Docster asserts that his father "was always in charge of the company," *see* Response to Statement of Material Facts by James Docster, ¶ 20, during all times relative to this action, he does not seriously dispute plaintiff's contentions that he ran day-to-day operations of the company from the date of his father's retirement until he was relieved of his duties on April 30, 1999. *See* Response to Statement of Material Facts by James Docster, Affidavit of James Docster and Reply Affidavit of James Docster. James Docster also does not dispute that he was a trustee and fiduciary of the subject 401(K) plan until the afore-referenced date. James Docster's factual disputes with

3

plaintiff center on his liability under ERISA for actions or inactions taken in connection with the retirement plan after April 30, 1999.[2]

With respect to the position, actions or inactions of Jack Docster during the relevant period, the Court notes the following facts taken from his deposition testimony, from his response to plaintiff's Local Rule 7.1(f) Statement of Undisputed Material Facts and from an affidavit submitted in opposition to plaintiff's summary judgment motion:  Following his limited "retirement" as president, Jack Docster maintained his status as CEO and Corporate Secretary of Dodge-Markham as well as his title as Chairman of the board of directors. *See* Response to Statement of Material Facts by Jack Docster, ¶ 10.  Defendants Jack and James Docster were the sole shareholders of Dodge-Markham.  When James became President of the company, he owned most of the common stock, but Jack Docster retained a controlling majority of the company's voting shares.  *See* Deposition of Jack Docster, at p. 74-75.  In or about 1995, Jack Docster suggested to his son that he "look into a 401(K)" for Dodge-Markham since the prior company plan had been dissolved upon Jack's retirement.  Deposition of Jack Docster, pp. 7, 12-14.  James Docster contacted the Bay Ridge Group which administered the company's health insurance coverage and made the arrangements to implement a new 401(K) plan.  *See id.* at p. 7. Thereafter, James Docster kept Jack Docster "generally . . . up to date on what he was doing with respect to establishment of the 401(K) plan."  *See id.*  Both Jack and James Docster were named as Trustees in the Adoption Agreement by which the Dodge-Markham retirement plan was implemented.  *See* Affidavit of Jack Docster at ¶ 36, *see also* Exhibit 1 marked during

---

[2] James Docster testified during his deposition that he was employed by and involved with the company until July 9, 1999, when he was discharged by his father. *See* Deposition of James Docster at pp. 40-41.

4

depositions of Jack and James Docster, attached as Exhibit D to Declaration of Jennifer Weekley, Esq., filed in support of plaintiff's motion.³  Upon establishment of the plan, Jack Docster "thought" that "the employer . . . was the administrator, of course, with the help of the Bay Ridge Group."  Deposition of Jack Docster, p. 8.  Insofar as the "employer's duties . . . as administrator," Jack Docster believed Dodge-Markham should "see to it that the employees' contributions were made, payroll deductions were made, and the company's contributions were made."  *Id.*  However, Jack Docster averred that he personally was not a trustee of the new Dodge-Markham retirement plan while James was running the company, *see id.* at p. 22, nor was he familiar with what the company was doing in regard to its position as administrator of the plan.  *Id.* at 8.  The reasons for this were multiple according to Jack Docster.  First, he was not allowed to participate in the plan since he was over age 70.  *See id.* at p. 9.  Secondly, Jack Docster testified that he was "busy with other things" such as "the running of the shop" and the company's "lack of finances."  *Id.*

Upon his retirement, though he lived in Florida during the winter months, Jack Docster continued to reside in Binghamton, New York for seven or eight months each year.  *See*

---

³
The Court notes that none of the exhibits attached to plaintiff's moving papers are certified, sworn to or in admissible evidentiary form.  The Court refers to said exhibits in the context of the present factual recitation only to the extent that they were adopted by reference during defendants' depositions or the facts contained in said exhibits are otherwise demonstrated in the record.  Jack Docster testified that he did not know he was named as a Trustee in the plan documents until the company received notification from the United States Department of Labor in July 1999, that contributions had not been made to the plan in accordance with ERISA.  *See* Deposition of Jack Docster at p. 82-83.  Jack Docster does admit to becoming a trustee of the plan sometime in 2001, when the company passed a resolution "substitut[ing]" him for James as trustee of the plan.  *Id.* at p. 23, *see also,* Exhibit G attached to Declaration of Jennifer Weekley, Esq., which indicates but does not establish said "substitution" occurred in May 2001.

Deposition of Jack Docster, p. 5.  When he was not in Florida or traveling, Jack Docster generally went to the Dodge-Markham offices and shop every day.  *See id.*  Jack Docster also continued to collect a salary for his continued involvement in Dodge-Markham affairs.  *See id.* at p. 6.  He "worked with Jamie [James Docster]," signed checks, including contribution checks to the retirement plan, when James was "too busy," spent time in the shop, and assisted James in "juggling" the company cash flow to meet financial obligations.  *See id.* at p. 6, 28, 32-33. According to Jack Docster, this "juggling" of available funds occurred in the following manner: the company comptroller would prepare checks owed to various company creditors and James kept these checks in his office.  *See id.* at p. 32-33.  Then "[b]oth Jamie and I together decided what we call juggling . . . the two of us on occasion - - sometimes he [James] would decide and sometimes the two of us would get together and decide based on the amount of money that would come in that particular day" which of the creditors to pay and which not to pay.  *See id.*  Jack Docster conceded during his deposition that this "juggling"  "might very well" have included contribution checks payable to Bay Ridge Group. *See id*.[4]

When Jack Docster was living in Florida, he maintained regular contact with Dodge-Markham by telephone and received daily financial summaries which included accounts payable and accounts receivable.  *See id.* at p. 10-11.  About every three months, James Docster, would send Jack Docster a printout or breakdown of the specific accounts payable by the company.  *See*

---

[4]

In an affidavit filed in opposition to plaintiff's motion, Jack Docster denies that he had any involvement in the company's financial operations from the date of his "retirement" until May 1999.  Specifically, Jack Docster avers "Contrary to the allegations in plaintiff's moving papers [and in his own deposition transcript], I was not involved in deciding what payables to pay or which creditors to pay.  I signed some Company checks from time to time.  I did not make the decision as to what checks were to be cut or which were to be disbursed." Affidavit of Jack Docster, ¶ 13.

*id.* at p. 11. At some point in 1998 or 1999, Jack Docster recalled seeing in the accounts payable information that Dodge-Markham owed money to Bay Ridge Group. *See id.* at p. 11-12. When Jack Docster saw this, he called James Docster "and asked him what was going on, and he said he was taking care of it." *See id.* at p. 12.[5] However, Jack Docster did not follow up with James to find out if he had indeed "taken care of it" as promised. *Id*. at 77. Starting in December 1998, paychecks issued to Jack Docster by Dodge-Markham were returned for insufficient funds. *See* Affidavit of Jack Docster, ¶ 18.

Jack Docster returned to Binghamton in early May 1999, and "took over the running of the company" from James, *see* Deposition of Jack Docster, p. 4; Affidavit of Jack Docster, ¶ 22, which included disbursement of checks. *See* Deposition of Jack Docster, ¶ 34. Thereafter, the company comptroller brought checks cut to creditors to Jack Docster. *See id.* These checks included checks that were "in the pipeline" prior to his taking over the company which had not yet been disbursed. *Id.*[6]

---

[5]

The Court notes that this portion of Jack Docster's testimony suggests that he was concerned upon seeing Bay Ridge listed as a creditor on the accounts payable printout, enough so that he took steps to investigate "what was going on." However, in a subsequent deposition passage, Jack Docster backtracked from this admission of early knowledge of a problem with funding of the retirement plan. To wit, he testified, that he "did not know" the company was delinquent in forwarding contribution payments despite receiving accounts payable printouts from James because if he "had seen Bay Ridge, [he] just assumed that that had to do with the Blue Cross" since Bay Ridge also administered the company's health insurance plan. Deposition of Jack Docster, p. 26. In his affidavit, Jack Docster also averred that "[d]uring the December 1998 to May 1999 time period, [he] was still receiving periodic financial summaries from James Docster, but they did not identify any failure to pay the 401(K) plan . . ." Affidavit of Jack Docster, ¶ 21

[6]

Jack Docster once again backtracked in later deposition testimony concerning the date of his taking control of the company from James. He denied that he "[took] over the company at the 1st of May." Deposition of Jack Docster, p. 25. Rather, Jack Docster averred that he and James "were acting together" for a time, and he "didn't assume all of the duties." *Id.*

7

During his subsequent investigation concerning the financial problems of the company, Jack Docster learned from talking to his son that Dodge-Markham was having trouble paying its suppliers and could not obtain credit to purchase paper supplies needed to run the business. *See* Deposition of Jack Docster, p. 29. Over the course of several weeks, Jack Docster averred that he learned that James Docster in recent years had increased his personal salary from $75,000.00 to $150,000.00 to between $250,000.00 and $350,000.00 per year. *See* Affidavit of Jack Docster, ¶¶ 22-23. Jack Docster also learned that James Docster had failed to remit employee withholding taxes to the IRS and had misappropriated over $1.2 million by preparing false invoices and sending them to the company's lender which would then advance funds on the basis of false accounts receivable. *See id.* at ¶ 24.

Jack Docster testified that upon taking control of the company back from James, he did know that the Dodge-Markham retirement plan had a trustee and "assumed" it was James because "it was just the two of us . . [t]here was (sic) no other officers." Deposition of Jack Docster, p. 27. However, Jack Docster did not familiarize himself with the duties of 401(K) plan administrator because "there was too much going on for [him] to even look into that." Deposition of Jack Docster, p. 26. In early July 1999, Jack Docster received a letter from the

---

According to Jack Docster, however, he did ultimately bar James from the company facility and remove him from the payroll on or after July 9, 1999. *See id.* at pp. 42, 63-64. In his opposing affidavit, Jack Docster pushes the date that he took control of the company from James back even further. To wit, Jack Docster averred that when he first returned to Binghamton from Florida, James Docster and others at the company were "evasive when questioned." Affidavit of Jack Docster at ¶ 22. "At first [he] couldn't get a clear picture of what was happening." *Id.* According to Jack Docster, his "full time control began in September 1999 after a period of investigation which began in May 1999. I started getting bad checks in December 1998 but did not do anything on a full time basis or assume control then." Jack Docster's affidavit is silent on the issue of his previous testimony concerning who would have been controlling the company after July 9, 1999, when he admitted to barring his son from the premises and removing him from the company payroll.

8

Department of Labor regarding the failure of the company to make contributions to the retirement plan as required by ERISA. *See* Deposition of Jack Docster, pp. 26, 30-31, 39. [7] This letter "surprised" and "disturbed" Jack Docster. *Id.* at 31. In early July 1999, Jack Docster also met with his son at James' house and told him company employees were accusing James of "stealing their 401(K) money." *Id.* at p. 30. According to Jack Docster, James denied these accusations and said that the company was simply "behind" in making payments to the retirement plan. However, in "mid 1999," Jack Docster did finally learn of Dodge-Markham's failure to make employee and company contributions to the retirement plan. Affidavit of Jack Docster at ¶ 28.

Sometime in July 1999, Jack Docster met with company employees "to ensure them that we're going to try and make up the deficiency." Deposition of Jack Docster at p. 35. However, at that time, Jack Docster testified that he did not know the amount or extent of the deficiency and he does not recall whether he asked James about it. *See id.* at p. 36. Jack Docster also testified that he took no steps to ascertain the amount of the 401(K) deficiency because he was too worried with keeping the company afloat and in its paper supply. *See id.* Jack Docster conceded that he "could have, but . . . didn't" determine the amount of the delinquency in the company's 401(K) plan simply by "looking at those checks [given to him by the company comptroller which he admitted to "juggling" due to lack of funds] and adding them up." *Id.* at p. 91. According to Jack Docster, the 401(K) deficiency "was not the pressing matter of the moment" and he had "no immediate plan" to fix it. *Id.* at pp. 37, 75. Indeed, in the three months

---

[7]

The letter in question is absent from the record but was marked and discussed as Exhibit 16 during the depositions of James and Jack Docster. The letter is described in the transcript appendices as "Letter dated 7/6/99 from US Department of Labor to Mr. Jack Docster, Trustee, and Mr. James Docster, Trustee."

9

following his meeting with employees wherein he told them he would take steps to rectify the company's failure to make required contributions to the retirement plan, Jack Docster took no steps to cure the problem. *See id.* at p. 41. Rather, he "was hoping for a miracle." *Id.*

In his affidavit submitted in opposition to plaintiff's motion, however, Jack Docster avers that he did talk to James about the deficiency in the Dodge-Markham retirement plan, that he did know the amount of the deficiency and he did have a strategy for how to resolve the deficiency. According to Jack Docster, "when [he] learned of the Plan's problems [he] received assurances from James Docster that he intended to use his account in the Plan to cure the deficiency. His account was of an amount nearly equal to the deficiency and I thought this would resolve the Plan's problems." Affidavit of Jack Docster at ¶ 40. However, "James Docster withdrew the funds from his account and did not use them to cure the deficiency." *See id.* at ¶ 41. When Jack Docster protested the proposed withdrawal of funds by James from the 401(K) plan, he testified that Nationwide Insurance Company told him simply there "was nothing they can do about it." Deposition of Jack Docster at p. 84. In his affidavit, Jack Docster averred that Nationwide told him that because he "was not a trustee, [he] had no authority to prevent the withdrawal" by James. Affidavit of Jack Docster at ¶ 41.

James Docster's version of how he intended to remedy the deficiency in the company's 401(K) plan is unremarkably at odds with his father's recollection. Indeed, James asserted in his answer and third-party complaint that he secured a loan for the company via Dodge-Markham's lender, BSB Bank, based on assignment of the value of life insurance policies owned by he and his wife.[8] James Docster asserts that he provided this collateral to BSB to obtain a loan which he

---

[8] The third party action filed by James Docster against Jack Docster and BSB Bank & Trust

intended should be used by the company to cure the 401(K) deficiency. *See* Affidavit of James Docster at ¶¶ 8, 10. According to James Docster, however, the loan proceeds were diverted by Jack Docster for other purposes. *See id.* Jack Docster denies that the loan secured by the company via James' insurance policies was intended to pay the retirement plan deficiency. Rather, Jack Docster asserts that the purpose of the loan, as evidenced by loan application and disbursement forms executed by James, was to pay the company's paper suppliers "and thereby stay in business." Affidavit of Jack Docster at ¶ 45.

Regardless of whether there was a plan in 1999 or at any time prior to 2001 when the company dissolved to cure the deficiency in the Dodge-Markham 401(K) account, and regardless of what the details of any alleged plan were, it is undisputed that no resolution of the problem occurred. Plaintiff seeks an order declaring defendants James and Jack Docster jointly and severally liable for losses attributed to the Dodge-Markham plan in the amount $46,949.82 in non-forwarded employee and company contributions along with an award of pre-judgment interest from the date of defendants' fiduciary breaches. In addition, plaintiff requests an order barring defendants permanently from serving as fiduciaries to any employee benefit plan and appointing an independent fiduciary to administer the affairs of the plan at issue herein.

### III. DISCUSSION

A.  Applicable Legal Standard

Defendants do not dispute that a breach of fiduciary duties occurred in connection with the Dodge-Markham retirement plan nor do they dispute plaintiff's contention concerning the amount of unpaid contributions to the plan. The primary legal and factual question before the

---

was settled in February 2004.

Court is whether James and/or Jack Docster were fiduciaries of the Dodge-Markham retirement plan and whether one or both breached fiduciary duties in connection with the plan. As defined in ERISA, one is a fiduciary with respect to an employee benefit plan to the extent "(i) he exercise[s] any discretionary authority or discretionary control respecting management . . . or disposition of its assets . . ." or "(iii) has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). ERISA directs that every plan designate a "named fiduciary" with power "to control and manage" the plan "so that responsibility for managing and operating the Plan - and liability for mismanagement - are focused with a degree of certainty." *Birmingham v. Sogen-Swiss Int'l Corp. Retirement Plan*, 718 F.2d 515, 522 (2d Cir. 1983). Indeed, in a House Report prepared by Congress when it was contemplating ERISA legislation states: "the plan document is to provide for the 'named fiduciaries' who have authority to control and manage the plan operations and administration. A named fiduciary may be a person whose name actually appears in the document, or may be a person who holds an office specified in the document, such as the company president." *Id*. at n. 3 (citing H. R. Conf. Rep. No. 1280, 93d Cong., 2d Sess. 297, reprinted in 1974 U.S. Code Cong. & Ad. News 5038, 5078).

Recently, in *Bouboulis v. Transport Workers Union of America*, --- F.3d ----, 2006 WL 620645, *7 (2d Cir. March 14, 2006), the Second Circuit held that § 1002(21)(A) creates a "bifurcated test" for fiduciary status under ERISA. To wit, "[s]ubsection one imposes fiduciary status on those who exercise discretionary authority, regardless of whether such authority was ever granted. Subsection three describes those individuals who have actually been granted discretionary authority, regardless of whether such authority is ever exercised." *Id.* (citing *Olson v. E.F. Hutton & Co., Inc.*, 957 F.2d 622, 625 (8th Cir. 1992); *Flanigan v. Gen. Elec. Co.*, 242

F.3d 78, 87 (2d Cir. 2001) ("Under this definition, a person ... has [fiduciary] status only 'to the extent' that he has or exercises the described authority or responsibility." (quoting *F.H. Krear & Co. v. Nineteen Named Trs*., 810 F.2d 1250, 1259 (2d Cir. 1987) (alternations in original))); *Blatt v. Marshall & Lassman*, 812 F.2d 810, 813 (2d Cir. 1987) ( "The definition of 'fiduciary' under ERISA focuses on the exercise, as well as the possession, of authority or control.")).

Based upon this bifurcated test, the Second Circuit rejected the claim that a labor union, who was listed as a plan administrator in member benefit plan documents, but asserted its responsibilities under the plan were "limited to purely ministerial functions," was not a fiduciary. The court stated "regardless of whether Local 100 ever exercised any discretionary authority as a Plan Administrator, Local 100 possessed discretionary authority and responsibility in the administration of the Plan, and was thus a fiduciary by virtue of being a Plan Administrator." *Id.* at *8. Indeed, the Second Circuit noted that "[r]elevant Department of Labor regulations have addressed this issue:

> Q: Does a person automatically become a fiduciary with respect to a plan by reason of holding certain positions in the administration of such plan?
>
> A: Some offices or positions of an employee benefit plan by their very nature require persons who hold them to perform one or more of the functions described in section 3(21)(A) of the Act. For example, a plan administrator or a trustee of a plan must, be [sic] the very nature of his position, have "discretionary authority or discretionary responsibility in the administration" of the plan within the meaning of section 3(21)(A)(iii) of the Act. Persons who hold such positions will therefore be fiduciaries.

Id. (quoting 29 C.F.R. § 2509.75-8). The Circuit criticized the district court's reliance on its previous determination in *Blatt, supra,* which stated "whether or not an individual or entity is an ERISA fiduciary must be determined by focusing on the function performed, rather than on the

13

title held." *Blatt,* 812 F.2d at 812. The court held that its holding in *Blatt* was not so limited:

> *Blatt* recognized that "Congress intended the term [fiduciary] to be broadly construed," and thus the determination of who exercised discretionary authority under subsection one of ERISA § 3(21)(A) was not limited by formal title. *Blatt* used its functional analysis to find that persons who actually exercised control over the disposition of Plan assets were fiduciaries under ERISA § 3(21)(A)(i). *Blatt* did not hold that persons or entities that have discretionary authority or responsibility in the administration of a plan, but who do not exercise it, are excluded from the definition of fiduciaries under ERISA § 3(21)(A)(iii). *Blatt* also does not suggest that formal titles are irrelevant for determining who possessed discretionary authority under subsection three of 29 U.S.C. § 1002(21)(A).

*Bouboulis v. Transport Workers Union of America*, --- F.3d ----, 2006 WL 620645, *8 (internal citations omitted). Based thereupon, the court found that "Local 100 should thus be considered a fiduciary under subsection three of ERISA § 3(21)(A), even if, as the district court found, there [was] no evidence that Local 100 actually exercised this authority."

B.      Fiduciary Status of James Docster

As referenced above, defendant James Docster does little, if anything, to contest plaintiff's allegations that he was a fiduciary of the Dodge-Markham retirement plan while acting as President of the company and that he breached his fiduciary duties in connection with the plan. James Docster's principle contention in opposition to plaintiff's motion is that after April 30, 1999, he was no longer a fiduciary and thus, he is not liable for any lapses or deficiencies which occurred in connection with the plan after that date  Furthermore, James Docster argues that he offered to and intended to cure the deficiency in the 401(K) plan with the afore-referenced loan against he and his wife's life insurance policies and that Jack Docster and BSB Bank conspired to divert these funds to other uses.

There is ample evidence in the record to support plaintiff's contention that James Docster

14

was a trustee, administrator and fiduciary of the Dodge-Markham 401(K) retirement plan from its inception until July 9, 1999, when he testified he was relieved of his duties at the company.  The Court rejects James Docster's attempt to create a genuine material issue for trial by averring in his affidavit that he had no involvement with the company after April 30, 1999.  A party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.  *See Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 619 (2d Cir. 1996) (citing *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)).  "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Perma,* 410 F.2d at 578.  Factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not "genuine" issues for trial. *Id.*  Based thereupon, the Court finds James Docster was a fiduciary of the Dodge-Markham retirement plan.

To the extent that James Docster contends that he "cured" any breach of fiduciary duties which occurred during his tenure as company President, he is mistaken.  Section 405 of ERISA, 29 U.S.C. § 1105, imposes on each fiduciary a liability for the breach of duty by a co-fiduciary if the first "has knowledge of a breach by such other fiduciary . . . (3) unless he makes reasonable efforts to remedy the breach.  *See Lee v. Burkhart*, 991 F.2d 1004, 1010 (2d Cir. 1993).  James Docster's conclusory and self-serving contention that he procured a loan to pay the unremitted contributions to the Dodge-Markham 401(K) plan, even assuming this was the purpose of the 1999 company loan, is not sufficient to demonstrate a "remedy" of his fiduciary breach.

C.      Fiduciary Status of Jack Docster

15

Throughout the present litigation, Jack Docster has vigorously denied that he was ever a fiduciary of the subject retirement plan or that he knew of and could have done anything to prevent or cure the deficiencies allegedly caused by company President James Docster. However, as evidenced by the record in this case, Jack Docster was a named trustee of the Dodge-Markham 401(K) plan and he was the company's CEO, Secretary and Chairman of the board of directors. He was one of only two shareholders of the company and held a majority of the voting stock. Furthermore, despite his arguments to the contrary, Jack Docster clearly had significant involvement in the management of the company and its financial affairs even after his limited "retirement." As the "retired" CEO and Secretary of the company, Jack Docster: 1) continued to receive a paycheck; 2) went to the office nearly every day of the 7 or 8 months of the year that he lived in Binghamton and "worked with Jamie [James Docster]" and concerned himself with "the running of the shop" and the company's "lack of finances;" 3) signed checks and assisted James with "juggling" payments to creditors based on availability of accounts payable funds; and 4) received daily financial information concerning company operations while in Florida.

Furthermore, with respect to his knowledge or involvement in administration of the company's retirement plan, Jack Docster admitted that he knew that Dodge-Markham, as the employer, was responsible for administering the plan which included making required company and employee contributions. He also knew that James was a trustee of the plan since he and James were the sole officers of the company. Jack Docster conceded that on at least one occasion prior to 1999, he noticed that contributions to the company's 401(K) plan owed to the Bay Ridge Group were on the list of accounts payable and he asked James Docster about it. However, Jack Docster conceded that he never followed up with James to ensure he had taken care of the failure

16

to make timely contributions. Jack Docster also acknowledged that he may have signed 401(K) contribution checks in James' stead prior to 1999 and that contribution checks might have been amongst those which he and James consistently "juggled" as operating funds became available.

Jack Docster has also attempted to reduce the significance of several of the above-referenced facts gleaned from his deposition testimony or create triable issues in connection therewith by submitting an affidavit which contradicts previous sworn evidence in the record. However, as referenced above, the Court will not countenance such tactics. *See Hayes,* 84 F.3d at 619 (citations omitted). Based on ample, legally uncontroverted evidence in the record, the Court finds that Jack Docster was a trustee and fiduciary of the Dodge-Markham employee benefit plan. The Court rejects Jack Docster's attempt to lay blame for the 401(K) debacle completely at the feet of James Docster. Even assuming the truth of Jack Docster's new claim that he knew nothing about how the 401(K) plan was being managed until September 1999, a fiduciary is chargeable with a co-fiduciary's breach of fiduciary responsibility if he enables the co-fiduciary to commit a breach through his failure to exercise prudence or otherwise fulfill his fiduciary responsibilities. *See* 29 U.S.C. § 1105(a)(2).[9]

---

[9] 29 U.S.C. § 1105(a) provides:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
> (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

17

Liability under this section of ERISA may be imposed where one fiduciary allows another to operate a plan without inquiry as to his conduct, thus enabling him to commit a breach. *See Free v. Briody*, 732 F.2d 1331, 1336 (7th Cir. 1984) (defendant, "having accepted a position as trustee, could not avoid liability for [co-fiduciary's] mismanagement of the Plan by simply doing nothing"); *Freund v. Marshall & Ilsley Bank*, 485 F.Supp. 629, 640 (D.C. Wis. 1979). Throughout the period of James Docster's tenure as President of Dodge-Markham, he deliberately failed to remit thousands of dollars in contributions to the plan. The fact that this was occurring would have been obvious to a genuine trustee. James Docster's ability to withhold significant contributions from the plan and to continue doing so for nearly five years was directly attributable to Jack Docster's abdication of the duty he owed to the plan's beneficiaries. Jack Docster's breach of his fiduciary duty enabled James Docster to commit his repeated breaches. Thus, even accepting Jack Docster's claim of complete non-involvement in the administration of the retirement plan, he breached his fiduciary obligations with respect to the plan as a matter of law.

Finally, to the extent that Jack Docster argued he is not liable under ERISA because by the time he learned of the problems with the 401(K), the company was "too far gone" for him to remedy the problems, he is gravely mistaken. Indeed, this contention is belied by the fact that as trustee of the plan and an integral officer in the management of the company's financial affairs who failed to ensure that plan contributions were made as required under ERISA, he contributed to and created the "difficult and unusual situation" he now attempts to use as a liability shield.

## IV.   CONCLUSION

For the foregoing reasons it is hereby

ORDERED that plaintiff's motion for summary judgment is GRANTED; and it is further

18

ORDERED that James Docster and the Estate of Jack Docster are jointly and severally liable to restore and make restitution to the Dodge-Markham 401(K) Plan in the amount of $46,949.82 plus interest; and it is further

ORDERED that James Docster and the Estate of Jack Docster are enjoined from ever serving as a fiduciary for this or any other employee benefit plan at any time in the future; and it is further

ORDERED that plaintiff may file any post-judgment applications for further relief including calculation of pre-judgment interest and appointment of an independent fiduciary to administer the affairs of the Dodge-Markham 401(K) plan within thirty (30) days.

IT IS SO ORDERED.

Date: March 31, 2006

_____
Norman A. Mordue
Chief United States District Court Judge